# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

− − − − − − − − − − − − − − − − − − − − − − − − − −X

ALLIANCE FOR RECREATIONAL
CANNABIS ENTITIES LLC                       :

                  Plaintiff,        :

         v.                                :        **Case No. 1:24-cv-03164**

DISTRICT OF COLUMBIA, et al.
                      :

             Defendants.        :

− − − − − − − − − − − − − − − − − − − − − − − − − −X

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### TABLE OF CONTENTS

INTRODUCTION ................................................................................. 7
SUMMARY OF FACTS ...................................................................... 7
LEGAL STANDARDS ........................................................................ 15
ARGUMENT ....................................................................................... 15
I. Plaintiff Demonstrates Substantial Likelihood of Success on the Merits .......................... 15
A. Seventh Amendment Violations ..................................................... 16
B. Fifth Amendment – Due Process .................................................... 22
C. D.C. Home Rule Act Violations ..................................................... 25
D. Dormant Commerce Clause Challenges ......................................... 26
E. Void-for-Vagueness Doctrine ........................................................ 28
F. Fifth Amendment – Takings Clause Violations .............................. 30
G. Contracts Clause Violations ........................................................... 32
H. Ex Parte Communications Violations ............................................. 35
I. Appropriations Act Violations ........................................................ 36
J. Fourth Amendment Violations ........................................................ 38
II. Plaintiff Demonstrates Irreparable Harm ....................................... 39
III. Balance of Equities Favors Plaintiff ............................................ 41
IV. Public Interest Considerations ...................................................... 43
CONCLUSION .................................................................................... 45

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, No. 23-5129, 2024 WL 4863140 (D.C. Cir. Nov. 22, 2024) .......................................................................... 41

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986) ........................................ 26

*Colonnade Catering Corp. v. United States,* 397 U.S. 72 (1970)............................................................ 39

*Curtis v. Loether,* 415 U.S. 189 (1974).................. 20

*Convention Center Referendum Committee v. District of Columbia Bd. of Elections and Ethics*, 441 A.2d 871 (D.C. 1980)……………..…………… 26

*Davis v. D.C.*, 158 F.3d 1342 (D.C. Cir. 1998)…….. 44

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ……………………………………………… 28

*District of Columbia v. E. Trans-Waste of Md., Inc.*, 758 A.2d 1 (D.C. 2000)…………………………… 42

*Dist. of Columbia v. Group Insurance Administration,* 633 A.2d 2 (D.C. 1993)…………… 42

*District of Columbia v. Walters,* 319 A.2d 332 (D.C. 1974) .......................................................................... 29

*Dist. of Columbia Metro. Police Dep't v. Dist. of Columbia Pub. Emp. Relations Bd.,* 301 A.3d 714 (D.C. 2023*)*………………………………………… 33, 34

*Embassy Real Estate Holdings, LLC v. D.C. Mayor's Agent For Historic Preservation*, 944 A.2d 1036 (D.C. 2008)…………………………………... 31

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)………………… 26

*Fuentes v. Shevin*, 407 U.S. 67 (1972)…………….... 24

*Gallothom, Inc. v. D.C. Alcoholic Bev. Control Bd.,* 820 A.2d 530 (D.C. 2003)………………………… 19, 36

*Gibson v. Berryhill*, 411 U.S. 564 (1973)………….. 23

*Gordon v. Dist. of Columbia*, 309 A.3d 543 (D.C. 2024)………………………………………………….. 31

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013)…. 44

*Howard Univ. v. Best*, 484 A.2d 958 *(D.C. 1984)*….. 20

*In re Sawyer*, 124 U.S. 200 (1888)………………… 21

*Lewis v. D.C. Com. on Licensure to Practice Healing Art*, 385 A.2d 151 (D.C. 1978)……………. 29

*Kirk v. Louisiana*, 536 U.S. 635 (2002)…………….. 39

*Llewelyn v. Oakland Cnty. Prosecutor's Off.*, 402 F. Supp. 1379 (E.D. Mich. 1975)……………………… 44

*Mathews v. Eldridge*, 424 U.S. 319 (1976)………… 25

*M.B.E. Inc. v. Minority Bus. Opportunity Comm'n of D.C.*, 485 A.2d 152 (D.C. 1984)…………………… 35

*Ne. Patients Grp. v. Maine Dep't of Admin. & Fin. Servs.*, 554 F. Supp. 3d 177 (D. Me. 2021) *aff'd by* 45 F.4th 542 (1st Cit. 2022)…………………………… 27

*NPG, LLC v. City of Portland,* No. 2:20-CV-00208, 2020 WL 4741913 (D. ME. Aug. 14, 2020)………... 27

*Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93 (1994)…………………… 27

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)…………………………………………… 29

*Payton v. New York*, 445 U.S. 573 (1980)………… 39

*Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978)………………………………… 30

*Pa. St. Bd. of Pharmacy v. Cohen*, 448 Pa. 189 (Pa. 1972)…………………………………………….. 29

*People v. David W.*, 95 N.Y. 2d 130 (2000)……….. 22

*Potomac Elec. Power Co. v. Pub. Serv. Comm'n.*, 319 A.3d 392 (D.C. 2024)………………………… 36

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)….. 27

*See v. City of Seattle*, 387 U.S. 541 (1967)………... 39

*Sec. & Exch. Comm'n v. Jarkesy,* 144 S. Ct. 2117 (2024)……………………………………………… 17

*Sloan v. United States*, 527 A.2d 1277 (D.C. 1987) 36

*Smith v. State*, 146 Idaho 822 (Idaho 2009)………. 22

*Speiser v. Randall*, 357 U.S. 513 (1958)…………… 22

*Taigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985 (W.D. Mo. 2021)…………………….. 27

*Tumey v. State of Ohio*, 273 U.S. 510 (1927)……... 17

*Tull v. United States*, 481 U.S. 412 (1987)………… 17

*Variscite NY One. Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022)………………………………… 27

*Ward v. Monroeville*, 409 U.S. 57 (1972)………….. 23

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977)………... 39

*West End Tenants Ass'n v. George Washington University,* 640 A.2d 718 (D.C. 1994)……………... 33

*Wildberger v. Am. Fed'n of Gov't Emps., AFL-CIO*, 86 F.3d 1188 (D.C. Cir. 1996)……………………... 24

*Williams v. Pennsylvania*, 579 U.S. 1 (2016)………. 23

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)…………………………………………….. 15

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)…………………………………………… 39

*Withrow v. Larkin*, 421 U.S. 35 (1975)…………….................................................... 23

*Woods v. D.C. Nurses' Examining Bd.*, 436 A.2d 369 (D.C. 1981)……………………………………. 29, 30

## Statutes, Regulations, & Rules

22-C D.C.M.R. § 5609.1 ..... 10

22-C D.C.M.R. § 5700 ..... 12, 28

42 U.S.C. § 1983 ..... 18, 20, 31

87 Stat. 774 – D.C. Home Rule Act ..... 25

Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, § 809(b), 136 Stat. 4459, 4722 (2022) ..... 36

D.C. Code § 1-204.04(a) ..... 25

D.C. Code § 1-204.22 ..... 26

D.C. Code § 2-509 ..... 36

D.C. Code § 7-1671.01 ..... 12, 27, 28, 32

D.C. Code § 7-1671.08 ..... 11, 13, 17, 23, 31, 32, 39

D.C. Code § 7-1671.12a ..... 13, 21

D.C. Code § 25-206(d) ..... 14, 26

D.C. Code § 25-207(a) ..... 14, 26

D.C. Code § 47-2851.02 ..... 14, 17, 29

D.C. Code § 48-904.01 ..... 8, 9, 10, 16, 25, 30, 32, 34, 37, 38, 40, 41, 44

Federal Rule of Civil Procedure 38 ..... 19, 20

D.C. Superior Court Civil Rule 38 ..... 18, 19

## U.S. Constitution

Contracts Clause (Article I, Section 10, Clause 1) ..... 14, 33, 35

U.S. Const. amend. IV ..... 38, 39

U.S. Const. amend. V ..... 15, 16, 22, 28, 30, 31, 32, 33

U.S. Const. amend. VII ..... 15, 16, 17, 18, 19, 20, 22

## Other Authorities

Blackstone, *Commentaries on the Laws of England* (1765-9) ..... 21

Joseph Story*, Commentaries on Equity Jurisprudence* (1st ed. 1836) ..... 21

Restatement (Second) of Torts § 821B (1979) ..... 21

Ronald A. Cass, *The Curtain Falls on Chevron: Will the Chevron Two-Step Give Way to A Simpler Loper Bright-Line Rule?,* 25 Federalist Soc' Rev. 320 (2024)

The Federalist No. 10, p. 59 (J. Cooke ed.1961) (J. Madison). ..... 23

COMES NOW, Plaintiff, Alliance for Recreational Cannabis Entities, LLC, by and through undersigned counsel and respectfully files this Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction.

## INTRODUCTION

The document is a motion filed by Plaintiff, Alliance for Recreational Cannabis Entities, LLC ("Plaintiff" or "Alliance"), seeking a preliminary injunction against the District of Columbia ("the District") and other defendants. Plaintiff argues that the enforcement actions by the defendants violate its members' constitutional rights and cause irreparable harm, the balance of equities tips in Plaintiff's favor, and an injunction is in the public interests.

It is imperative that the District of Columbia is structured to comport with the United States Constitution. As confirmed by public records and existing laws, the District of Columbia is not. This brief provides background on the legalization of possession and transfer of small amounts of cannabis in the District of Columbia through a voter-approved initiative (I-71) in 2014. However, this brief will also further detail how the District has undertaken efforts to unconstitutionally undermine legally sanctioned cannabis activity and force businesses into the medical cannabis market.

## SUMMARY OF FACTS

1.      On November 4, 2014, 64.8% of the voting residents in the District of Columbia voted to approve the "Legalization of Possession of Minimal Amounts of Marijuana for Personal Use Act of 2014" (commonly known as "I-71") to allow recreational adult cannabis possession and use in the District of Columbia.

2.      However, soon after, Congress enacted a budget rider, known commonly as the "Harris Rider," in December 2014 and prohibited the District of Columbia from enacting or

carrying out any law, rule, or regulation to legalize or otherwise reduce penalties associated with

the possession, use, or distribution of recreational cannabis.

3.      The Legalization of Possession of Minimal Amounts of Marijuana for Personal

Use Act of 2014 was codified into the D.C. Criminal Code as D.C. Code § 48-904.01(a)(1)(A)

and (B), which state:

> "Notwithstanding any provision of this chapter to the contrary, it shall be lawful, and shall not be an offense under District of Columbia law, for any person 21 years of age or older to:
>
> (A) Possess, use, purchase, or transport marijuana weighing 2 ounces or less;
> (B) Transfer to another person 21 years of age or older, *without remuneration*, marijuana weighing one ounce or less; (emphasis added)"

4.      Since the enactment of D.C. Code § 48-904.01(a)(1)(A) and (B), the District of

Columbia has undertaken systematic efforts to undermine legally sanctioned cannabis activity,

effectively rolling back freedoms democratically established by the residents of the District. The

District took both criminal and civil actions to this end.

5.      On the criminal side, the District of Columbia initiated its systematic campaign to

criminalize lawful cannabis activity within the District by leveraging enforcement actions by the

Metropolitan Police Department, often leading to criminal prosecutions. These cases frequently

culminated in Deferred Prosecution Agreements that were ultimately dismissed or resulted in

misdemeanor convictions, as well as plea agreements producing similar outcomes.

6.      On the civil side, the District of Columbia decided to bolster its medical cannabis

market by challenging, paralleling, and directly competing with the recreational cannabis sector,

commonly referred to as "I-71 shops." The District offered incentives and inducements to

encourage individuals and businesses to participate in the medical cannabis marketplace.

7.      "I-71 shops" first came about in accordance with the aforementioned D.C. Code §
48-904.01(a)(1)(B). These "I-71 shops" are retail and service businesses where, as a non-
commercial component, cannabis transfers occurred solely between adults aged 21 or older,
limited to one ounce. These businesses generated income by selling a diverse range of goods and
services without selling, offering, or making cannabis available for sale. Cannabis was
transferred without remuneration, fully aligning with the provisions of the D.C. Code and
underscoring these businesses' adherence to lawful practices.

8.      Most I-71 shops operated profitably and were not attracted to the medical
cannabis market, which was unprofitable and beset with systemic issues. These issues included
supply chain shortages, inadequate infrastructure, the requirement of self-incriminating
disclosures during the application process, unconstitutional licensing requirements and
regulations, and the absence of mandatory laboratory testing.

9.      For example, the first testing laboratory in the District of Columbia did not
become operational until 2024—nearly a decade after the District began dispensing medical
cannabis to the public. Consequently, for ten years, medical cannabis products were not subject
to laboratory testing within the District of Columbia, raising serious concerns about the safety,
regulatory oversight, and potentially misleading nature of these products.

10.      The District of Columbia allowed medical cannabis cultivators and manufacturers
to "self-certify" the potency, chemical composition, and contaminants of the cannabis dispensed
as "medical cannabis" with no other quality control safeguards. The District of Columbia
facilitated the sale of untested cannabis to the mass public in a manner that misled the public to
believe that the cannabis was medical grade and lab tested. The District of Columbia was aware
that it was misleading the public because 22-C D.C.M.R. § 5609.1 provides: "Dispensaries and

cultivation centers may dispense or distribute medical marijuana in any form deemed safe which allows patients to eat, inhale, or otherwise use medical marijuana for medical purposes. Medical marijuana shall be subject to testing for quality assurance and safety purposes."

11.    After receiving complaints from the medical cannabis market participants, the District of Columbia, in response, enacted the Medical Cannabis Amendment Act of 2022 (the "Act") and rolled out a combined enforcement and licensing scheme that aimed to force people and businesses into the medical cannabis market.

12.    The Act, first and foremost, allowed patients to self-certify that they have medical or dental conditions qualifying them for treatment by cannabis.

13.    The Act also included D.C Code §§ 7-1671.06a-b, which targeted recreational adult cannabis.  However, these new laws did not set a distinction between legal and illegal recreational adult cannabis activity and wrongfully and indiscriminately outlawed all recreational adult-use cannabis activity in direct contradiction to D.C. Code § 48-904.01(a)(1)(A) and (B).

14.    The District of Columbia then enacted D.C. Code § 48-1201: the possession or transfer without remuneration of marijuana weighing one ounce or less shall constitute a civil violation, but such a violation shall not constitute a criminal offense or a delinquent act, which contradicts the language of D.C. Code § 48-904.01(a)(1)(A) and (B) (legalizing the transfer of up to one ounce of cannabis without remuneration).

15.    The District of Columbia simultaneously authorized the Mayor to issue and adjudicate the penalties associated with the civil violations. D.C. Code § 47-2844(a-2)(1) provides that "…the Mayor, for the first…[illegal sale, negotiation for sale, or use of any controlled substance as that term defined in Chapter 9 of Title 48]…shall issue a fine in the amount of $2,500…, for the second violation…shall issue a fine in the amount of $5,000…[and]

10

for the third violation…shall issue a fine in the amount of $10,000." D.C. Code § 7-1675.01(b) provides that "[f]or any subsequent violations of D.C. Official Code § 47-2844(a-2)(1B): the Mayor shall issue a fine in the amount of up to $10,000 to the commercial property owner." D.C. Code § 7-1671.08(f)(2)(A) provides that "[f]or the second violation, the ABC Board may: issue a fine in the amount of $10,000…"

16.     The Medical Cannabis Amendment Act of 2022 also transferred the Department of Health's role in the cannabis industry to the Alcoholic Beverage and Cannabis Administration ("ABCA") and the Alcoholic Beverage and Cannabis Board (the "ABC Board"). The latter is now mandated to oversee, enforce, regulate, and preside over the systematic forced entries into the medical cannabis marketplace in the District of Columbia.

17.     ABCA devised various open application periods to accept submissions for Retail, Cultivation, Manufacturing, and Courier Medical Cannabis licenses, as follows:

18.     From August 29, 2023, through October 30, 2023, ABCA opened an application period for Courier, Cultivation Center, and Manufacturer license applications for standard and social equity applicants, pursuant to the requirements of the Medical Cannabis Amendment Act of 2022 and associated regulations set forth in Title 22-C.

19.     From November 1, 2023, through January 29, 2024, ABCA opened an application period for Retailer, Internet Retailer, and Cultivation Center licenses for unlicensed establishments, pursuant to the requirements of the Medical Cannabis Amendment Act of 2022 and associated regulations set forth in Title 22-C.

20.     From March 1, 2024, through April 30, 2024, ABCA opened an application period for Retailer and Internet Retailer licenses for social equity applicants, pursuant to the

requirements of the Medical Cannabis Amendment Act of 2022 and associated regulations set forth in Title 22-C.

21.    From July 1, 2024, through August 29, 2024, ABCA opened an application period for Retailer and Internet Retailer licenses for standard applicants, pursuant to the requirements of the Medical Cannabis Amendment Act of 2022 and associated regulations set forth in Title 22-C.

22.    During these licensing rounds, only businesses incorporated in the District of Columbia were allowed to apply. D.C. Code § 7-1671.01(20C). Additionally, the Act guaranteed at least half of the licenses to be issued to "social equity applicants," but these social equity applicants also have to be D.C. residents. *Id.* Similarly, "a dispensary shall not be permitted to receive or purchase medical marijuana from a person other than a cultivation center registered in the District." 22-C D.C.M.R. § 5700.

23.    All but one members of the Alliance attempted to apply during these licensing rounds. However, out of the Alliance's applicants, one member of the Alliance was precluded from applying for a license because the entity was not incorporated in the District. Three other members were excluded in the Social Equity round of application because their owners reside in Maryland and Virginia instead of the District, even though their prior arrest records would otherwise qualify them as social equity applicants. Additionally, one member is on the verge of being approved by the ABC Board to become fully licensed, and they are thereby close to losing their access to cannabis from Maryland.

24.    After the conclusion of all of the medical cannabis licensing rounds, the District of Columbia increased enforcement by issuing cease-and-desist orders and summarily closing businesses without pre-deprivation hearings, even though these cease-and-desist orders and summary closures deprive store owners of significant property and liberty interests. It is the ABC

Board's practice and customs that the Board hosts closed-door hearings and then issues initial cease-and-desist orders after hearing uncontested evidence

25.     All members of the Alliance have received cease-and-desist orders and requested hearings. One member has attended the hearing and lost. The same member was then summarily closed. Meanwhile, another member did not receive a cease-and-desist order but was summarily closed.

26.     The cease-and-desist contained inaccurate facts and conclusions of law. However, the procedures that produced these erroneous results were even more egregious.

27.     It is the ABC Board's practice and customs that the board's chairman acts as both the prosecutor and the decisionmaker in these cease-and-desist hearings. The board's chairman calls witnesses for the government, personally cross-examines the accused's witnesses, examines evidence submitted by the accused, objects to counsels' lines of questioning, and ultimately recommends a decision to be taken by the ABC Board. At least in 2024, the ABC Board has never voted against the chairman's recommendation.

28.     Moreover, D.C. Code § 7-1671.08b provides that fines levied by the ABC Board against the "unlicensed establishments" shall be deposited into a Medical Cannabis Social Equity Fund, while the money in the Fund shall be used to administer various medical cannabis programs, funds, loans, and equities.

29.     Furthermore, D.C. Code § 7-1671.12a(b)(1)'s hearing is the only tribunal where a respondent is permitted to appear and defend himself before an ABC Board's cease-and-desist order becomes final and binding. However, the chairman at these hearings places the burden of proof on the respondent to disprove the Board's fact-finding in its cease-and-desist orders.

30.     There is also a structural issue with the ABC Board and its affiliated agency. Executive matters should not be subject to the encroachment of the D.C. Council's legislative powers. Nonetheless, D.C. Code § 25-206(d) provides that the Mayor can only remove an ABC Board member for just and reasonable cause. D.C. Code § 25-207(a) provides that ABCA's director can only be removed by the ABC Board for just and reasonable cause.

31.     ABCA policies, customs, and tactics further include enforcement against commercial landlords. ABCA issues fines and license recissions to pressure the landlords into terminating leases with their I-71 tenants, such as Plaintiff's members, who have received cease-and-desist and/or summary closure orders.

32.     The landlord enforcement scheme described in the Complaint is a violation of Article I, Section 10, Clause 1 of the United States Constitution, commonly referred to as the Contracts Clause. The District of Columbia is subject to the restrictions and limitations of the Contracts Clause through the Home Rule Act, which subjects the legislative power of the District to all the restrictions and limitations of the Contracts Clause of the U.S. Constitution.

33.     In the meantime, the District's Department of Licensing and Consumer Protection ("DLCP") acts in conjunction with the ABC Board in these enforcement actions. The DLCP issues fines to "unlicensed establishments" based on D.C. Code § 47-2851.02 and always alleges that the establishment operated "a business (cannabis retail) without a license or endorsement." The only avenue for the respondents to challenge these fines was through the District's Office of Administrative Hearings ("OAH"). Respondents do not have an avenue to bring the fines to D.C. Superior Court. Two members of the Alliance received such fines and requested hearings with the OAH.

14

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.  Plaintiff Demonstrates A Substantial Likelihood That It Will Prevail On The Merits.

Plaintiff presents a compelling case for success on the merits, supported by constitutional, statutory, and factual evidence and theories. Plaintiff argues that the enforcement actions by the ABC Board and other Defendants violate its members' Seventh Amendment right to a jury trial in common-law actions. Specifically, Plaintiff contends that the imposition of monetary penalties and property deprivations without the opportunity for a jury trial is unconstitutional. Plaintiff argues that these enforcement actions infringe on its Fifth Amendment right to procedural due process. The administrative proceedings lack impartiality, as the ABC Board's chairman acts as both prosecutor and decision-maker, and the fines levied in these hearings would go to the ABC Board's medical cannabis program.

Additionally, pre-deprivation hearings are not provided, and the post-deprivation hearings are insufficient, leading to erroneous determinations and significant harm to the Plaintiff's members. Plaintiff argues that the ABC Board's licensing regime violates the Dormant Commerce Clause and facially discriminates against Plaintiff's out-of-state members. Plaintiff argues that the ABC Board's cease-and-desist orders should be voided because the Board's structure violates the D.C. Home Rule Act's doctrine of separation of power. Plaintiff argues that the ABC Board, DLCP, and MPD are enforcing laws that are facially invalid under

the Fourth and Fifth Amendments. Plaintiff argues that the ABC Board's practices and customs violate the District of Columbia Administrative Procedure Act. Plaintiff argues that medical cannabis statutes and provisions that contradict D.C. Code § 48-904.01 are facially invalid. Plaintiff argues that the Act is preempted by the Harris Rider provisions of Congressional Appropriations Acts.

Plaintiff also raises facial challenges to specific statutes, including D.C. Code §§ 7-1671.01(9) and 7-1671.08, arguing that they are unconstitutionally vague. These statutes conflict with the legal protections provided under D.C. Code § 48-904.01(a)(1)(A) and (B), creating ambiguity and enabling arbitrary enforcement. This regulatory inconsistency undermines Plaintiff members' ability to operate within the bounds of the law. Given these robust constitutional claims and evidentiary support, Plaintiff has established a substantial likelihood of prevailing on the merits. Granting the requested injunction serves not only to protect Plaintiff but also to:

1. Signal to regulators the importance of adhering to constitutional mandates.

2. Encourage the adoption of clearer, more equitable statutes and procedures.

3. Foster an environment where businesses can operate without fear of arbitrary or contradictory enforcement.

The injunction aligns with public interest goals, including transparency, accountability, and the proper implementation of voter-approved measures such as Initiative 71.

### A. SEVENTH AMENDMENT

### 1. The ABC Board And DLCP Lack The Constitutional Authority To Adjudicate Fines

In the instant case, "the remedy is all but dispositive…civil penalt[ies] are a type of remedy at common that could only be enforced in courts of law." *Sec. & Exch. Comm'n v.*

*Jarkesy,* 144 S. Ct. 2117, 2120 (2024). If "the civil penalties in this case are designed to punish and deter, not to compensate," then "they are…a type of remedy at common law that could only be enforced in courts of law." *Id. See* Ronald A. Cass, *The Curtain Falls on Chevron: Will the Chevron Two-Step Give Way to A Simpler Loper Bright-Line Rule?*, 25 Federalist Soc' Rev. 320, 328 (2024) (summarizing that after *Jarkesy* there is a Seventh Amendment right to jury-trial in civil penalty cases). *See also Tull v. United States,* 481 U.S. 413 (1987) (emphasizing that relief sought is more important than finding a precisely analogous common-law cause of action).

Here, fines provided by the relevant D.C. Code are designed to punish and deter, not to compensate. D.C. Code § 47-2844(a-2)(1) provides that "…the Mayor, for the first…[illegal sale, negotiation for sale, or use of any controlled substance as that term defined in Chapter 9 of Title 48]…shall issue a fine in the amount of $2,500…, for the second violation…shall issue a fine in the amount of $5,000…[and] for the third violation…shall issue a fine in the amount of $10,000." D.C. Code § 7-1675.01(b) provides that "[f]or any subsequent violations of D.C. Official Code § 47-2844(a-2)(1B): the Mayor shall issue a fine in the amount of up to $10,000 to the commercial property owner." D.C. Code § 7-1671.08(f)(2)(A) provides that "[f]or the second violation, the ABC Board may: issue a fine in the amount of $10,000…" These tiered civil penalties are clearly designed to punish and deter, not to compensate. Therefore, they are a type of remedy at common law that could only be enforced in courts of law and the ABC Board possesses no constitutional authority to adjudicate fines.

The same principle should apply to fines issued by DLCP. The DLCP issues civil penalties to "unlicensed establishments" based on D.C. Code § 47-2851.02 and always alleges that the establishment operated "a business (cannabis retail) without a license or endorsement." These civil penalties can only be adjudicated in a court and in front of a jury.

The administrative adjudications conducted by the District of Columbia's ABC Board and DLCP without providing a jury trial unequivocally violate the Seventh Amendment of the United States Constitution. This Amendment guarantees the right to a jury trial in suits at common law where the value in controversy exceeds twenty dollars. The right is not confined to the common-law forms of action recognized at the Amendment's ratification but extends to all legal actions that are not of equity or admiralty jurisdiction.

The Seventh Amendment applies to the District of Columbia and its agencies. The District's legislative power is subject to the same limitations applicable to the Federal government under the U.S. Constitution. Therefore, the constitutional right to a jury trial, as preserved by the Seventh Amendment, is fully applicable to the District of Columbia's laws and administrative actions.

 D.C. Superior Court Civil Rule 38 further reinforces this application. This rule preserves the right to a jury trial as declared by the Seventh Amendment or provided by applicable statutes. This rule underscores the District of Columbia's recognition of the individual right to a jury trial in civil proceedings. The incompatibility between this rule and ABCA's enforcement practices highlights the constitutional violation inherent in adjudicating legal disputes without offering a jury trial.

Under 42 U.S.C. § 1983, any person acting under color of state law who deprives a citizen of constitutional rights is liable to the injured party. ABCA's enforcement actions, sanctioned by specific District of Columbia statutes, have deprived the Plaintiff of the constitutional right to a jury trial. The statutes in question, D.C. Code §§ 47-2844(a-1)(1)(A) and (B); 47-2844(a)(2); 7-1675.01(b); 7-1671.08(f)(2)(A); 7-1671.08(d); 7-1671.12e(a); 7-1671.12a(b)(1); and 47-2851.02 authorize the imposition of civil penalties and declarations of

nuisance without offering any mechanism for a jury trial. These penalties are punitive, focusing on culpability, deterrence, and recidivism, and are akin to traditional common-law actions at law, which historically require a jury trial.

The "public rights" exception, which allows Congress to assign certain disputes to non-Article III tribunals without a jury trial, does not apply here. The rights at issue are private rights concerning legal remedies traditionally enforced in courts of law. They are not part of a specialized regulatory scheme necessitating administrative adjudication. The penalties imposed are not integral to a federal regulatory program requiring expert administrative resolution but are straightforward legal sanctions akin to those in common-law actions.

ABCA's practices exacerbate this constitutional violation. The Board conducts closed-door meetings and issues cease-and-desist orders and summary closures without allowing respondents to challenge evidence or participate in hearings, as outlined in D.C. Municipal Regulation 22-C Section 6280.1. These practices deny due process and further infringe upon the Plaintiff's constitutional rights.

The statutes fail to provide any avenue for the Plaintiff to exercise the right to a jury trial, rendering them unconstitutional on their face. They do not offer any circumstances under which a litigant can exercise this fundamental right, thus failing the test for facial constitutionality.

The enforcement of these statutes directly conflicts with the Seventh Amendment, Federal Civil Procedure Rule 38, and D.C. Superior Court Civil Rule 38, which preserves the right to a jury trial. The D.C. Court of Appeals found the jury's role may determine, "as the representative of the larger community, on a case-by-case basis, the behavior which the values and norms of the community, as only generally expressed in the D.C. Statute, will not tolerate.". *Howard Univ. v. Best*, 484 A. 2d 958, 981 (D.C. 1984). By circumventing this rule through

administrative adjudication without jury trials, ABCA and other Defendants violate both local procedural rules and constitutional mandates and sidestep the community representative role of the jury. By enforcing statutes and practices that deprive the Plaintiff of the Seventh Amendment right to a jury trial, Defendants, acting under color of law, are liable under 42 U.S.C. § 1983. Plaintiff's members have suffered financial losses, business disruption, and reputational harm as a direct result of these unconstitutional actions.

In conclusion, the ABCA's administrative adjudications without a jury trial are unconstitutional. The Seventh Amendment applies to the District of Columbia and its agencies. The rights at issue are legal in nature and are not part of a specialized regulatory scheme necessitating administrative adjudication. The "public rights" exception does not apply. The statutes in question are incompatible with the constitutional guarantee of a jury trial and conflict with Federal Rule of Civil Procedure 38.

Therefore, Plaintiff demonstrates a substantial likelihood to succeed on its Seventh Amendment claim.

## 2. The ABC Board Lacks the Constitutional Authority to Adjudicate Cease-and-Desist Orders

The Seventh Amendment right itself is not limited to the "common-law forms of action recognized" when the Seventh Amendment was ratified. *Curtis v. Loether*, 415 U.S. 189, 193 (1974). In *Jarkesy*, the Court found that Congress used "fraud" and other common law terms of art. Thereby, Congress incorporated prohibitions from common law fraud into federal securities law. *Jarkesy,* 144 S. Ct., at 2120.

Here, D.C. Code § 7-1671.12e(a) provides that "any building, where cannabis is sold, exchanged…by an unlicensed establishment shall be a *nuisance*." This section has been cited in

every single cease and desist order the ABC Board has issued to "unlicensed establishment." Nuisance has been a recognized common-law form of action since the 12th century. Blackstone, *Commentaries on the Laws of England* (1765-9) n. 47.

Additionally, the "origin" of public nuisance was criminal, Restatement (Second) of Torts § 821B cmts a, b (1979); and it is axiomatic that a defendant must be afforded a jury trial for all criminal and quasi-criminal actions. *See, e.g., In re Sawyer*, 124 U.S. 200, 209-210 (1888). Even after claims for public nuisance lost their exclusively criminal character, they remained primarily actions at law. Even in the "rare instances" where equity was invoked, disputed questions of public nuisance were tried to juries at law before the equity courts would grant relief. Justice Story, the country's leading equity scholar of the early nineteenth century, stated the settled rule of common law that "the question of [public] nuisance or not must, in cases of doubt, be tried by a jury." II Joseph Story, *Commentaries on Equity Jurisprudence, as Administered in England and America* § 923, at 202 (1st ed. 1836). Therefore, as the D.C. Council deliberately incorporated "nuisance" as a common-law term of arts in the ABC Board's cease-and-desist authority, respondents to these orders should be entitled to jury trials, and the ABC Board has no constitutional authority to adjudicate these quasi-nuisance claims.

In sum, following *Jarkesy*, adjudications involving civil penalties that resemble common-law actions require jury trials unless the "public rights" exception applies. The fines imposed by the ABC Board and DLCP and the punitive nature of its cease-and-desist actions mirror traditional common-law claims, invalidating their adjudication through in-house administrative processes. Therefore, following the *Jarkesy* decision, if a DC agency adjudication involves claims that are akin to traditional legal actions requiring a jury trial under the Seventh Amendment, and the "public rights" exception does not apply, the adjudication may be deemed

21

unconstitutional without a jury trial. This would necessitate bringing such cases in an Article III court where a jury trial can be provided.

### B. FIFTH AMENDMENT – DUE PROCESS

### 1. The ABC Board's Burden Shifting Scheme Violates Procedural Due Process

Due process commands that "no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt." *Speiser v. Randall*, 357 U.S. 513, 524 (1958). "In civil cases too, this Court has struck down state statutes unfairly shifting the burden of proof." *Id. See People v. David W.*, 95 N.Y. 2d 130 (2000) (striking down a New York statute where the state did not bear the burden of proof at any proceeding before a neutral fact finder); and *Smith v. State*, 146 Idaho 822 (2009) (striking down Idaho's statutory scheme because it failed to provide notice and a meaningful opportunity to be heard at a meaningful time and in a meaningful manner by placing the burden of proof on the offender at the only hearing in which is he permitted to appear).

Here, the ABC Board provides only one hearing after a cease-and-desist or summary closure order is issued. During this hearing, the ABC Board places the burden on the accused to present evidence to persuade to Board to lift the cease-and-desist or summary closure order. No man should lose his liberty or business unless the ABC Board has borne the burden of producing evidence and convincing a neutral factfinder of the accused's guilt. Therefore, the ABC Board's practice contravenes the commands of procedural due process.

### 2. The ABC Board's Structure Violates Procedural Due Process

"No man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." The Federalist No. 10, p. 59 (J. Cooke ed.1961) (J. Madison). In practice, the Supreme Court has held before that due process

required a decisionmaker's disqualification because of his official motive to convict and to graduate the fine to help the financial needs of the village. *Tumey v. State of Ohio*, 273 U.S. 510, 535 (1927). This concern with conflicts resulting from financial incentives was further elaborated in *Ward v. Monroeville*, 409 U.S. 57 (1972). In *Ward*, the Court invalidated a conviction in another mayor's court, where fines the mayor assessed went to the town's general treasury. *Id.*, at 60. *See Gibson v. Berryhill*, 411 U.S. 564 (1973) (stating that the decisionmaker's financial stake need not be as direct or positive as it appeared to be in *Tumey*).

Here, D.C. Code § 7-1671.08b provides that fines levied by the ABC Board against the "unlicensed establishments" shall be deposited into a Medical Cannabis Social Equity Fund, while the money in the Fund shall be used to administer various medical cannabis programs, funds, loans, and equities. This provision should require the disqualification of the ABC Board from adjudicating cannabis related civil fines, as the Board would have an official motive to convict and to graduate the fine to help the financial needs of the Board's medical cannabis programs.

### 3. The ABC Board's Lack of Appearance of Neutrality Violates Procedural Due Process

The ABC Board cannot dispute that it acts in a dual role as prosecutor and judge, including by making "critical decision[s]" in the prosecution of cases. *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). Even though "[t]he combination of investigative and adjudicative functions does not, without more, constitute a due process violation," *Withrow v. Larkin*, 421 U.S. 35, 58 (1975), there is more here. Moreover, courts must "be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice." *Wildberger v. Am. Fed'n of Gov't Emps., AFL-CIO*, 86 F.3d 1188, 1195-96 (D.C. Cir. 1996).

The Board's chairman acts in a dual capacity as both prosecutor and decision-maker during fact-finding, cease-and-desist, and summary closure hearings. He calls witnesses for the government, cross-examines the accused's witnesses, examines evidence, objects to counsel's questioning, and ultimately recommends the Board's decision. It is noteworthy that a recommendation of the Board Chairman has never been rejected by the Board. In fact, there was not even a single case of a split vote in 2024. This conflation of roles violates the requirement for an impartial adjudicator and undermines the fairness of the proceedings.

Furthermore, the ABC Board conducts closed-door fact-finding hearings prior to issuing cease-and-desist orders or summary closures, relying solely on *ex parte* communications and the testimony of a single investigator. These hearings exclude the Plaintiff, denying any opportunity to challenge evidence or present a defense before the deprivation occurs. Such procedures are inconsistent with due process requirements, as they fail to provide notice and a meaningful opportunity to be heard at a time when the deprivation can still be prevented. *Fuentes v. Shevin*, 407 U.S. 67 (1972).

Accordingly, the aforementioned practices and procedures demonstrate the ABC Board's lack of neutrality.

### 4. The ABC Board's Lack of Pre-Deprivation Hearings Violates Procedural Due Process

The three factors to determining whether a pre-deprivation hearing is required are: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Matthews v. Eldridge*, 424 U.S. 319, 340-48 (1976).

Here, Plaintiff's members whose businesses were summarily closed clearly have a property interest in continuously operating the business without interruption. However, these members were not afforded with a pre-deprivation hearing. Therefore, they were deprived of procedural due process due to the lack of pre-deprivation hearings. Under *Mathews v. Eldridge*, pre-deprivation hearings should have been afforded because

(1) Private Interest: Plaintiff's ability to operate its business and sustain its livelihood is significant;

(2) Risk of Erroneous Deprivation: ABCA's flawed procedures, including reliance on closed-door hearings and one-sided investigative reports, have already led to erroneous findings and outcomes (e.g., the Cease-and-Desist Order and Summary Closure), where ABCA wrongly accused respondents of lacing cannabis with amphetamine when the results were produced by false-positive presumptive field tests;

and (3) Government Interest: While protecting public health is significant, enforcement against lawful cannabis activity contradicts D.C. Code § 48-904.01(a)(1)(B) and undermines procedural safeguards, making the government's interest less compelling. Additionally, if the District had truly cared about public health, it would not have allowed licensed cultivators to self-certify their cannabis' potency and contaminations.

**C. 87 STAT. 774 – D.C. Home Rule Act**

D.C. Home Rule Act provides that the legislative power granted to the District is vested in and shall be exercised by the D.C. Council. D.C. Code § 1-204.04(a). D.C. Home Rule Act also provides that the executive power of the District shall be vested in the Mayor, who shall be the chief executive officer of the District government. D.C. Code § 1-204.22. Since the system of government vesting executive/administrative, legislative, and judicial functions in separate

entities has been established in the District of Columbia, nonlegislative matters cannot properly

be submitted for initiative without violating the sanctity of that division of responsibility.

*Convention Center Referendum Committee v. District of Columbia Bd. of Elections and Ethics*,

441 A.2d 871, 875 (D.C. 1980). Similarly, executive matters should not be subject to the

encroachment of the D.C. Council's legislative powers. Specifically, dual for-cause limitations

on the removal of executive officers contravene the doctrine of separation of powers. *Free*

*Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010). In *Free*

*Enterprise Fund*, Securities and Exchange Commissioners "cannot themselves be removed by

the President except for 'inefficiency, neglect of duty, or malfeasance in office.'" *Id*. at 477.

Additionally, the Securities and Exchange Commissioners cannot remove Public Company

Accounting Oversight Board ("PCAOB") members at will, but only "for good cause shown," "in

accordance with" specified procedures. *Id.*

      Here, like the Securities and Exchange Commissioners, ABC Board members can only be

removed by the Mayor for just and reasonable cause. D.C. Code § 25-206(d). Additionally, just

like the PCAOB members, ABCA's director can only be removed by the ABC Board for just and

reasonable cause. D.C. Code § 25-207(a). This is exactly the dual for-cause limitation structure

the Court prohibited in *Free enterprise Fund*.

      Therefore, the ABC Board's structure encroaches on the Mayor's executive functions.

These limitations violate the D.C. Home Rule Act, which delineates legislative and executive

powers. As a result, Board orders issued under this unlawful structure should be set aside.

### D. Dormant Commerce Clause

      A court evaluates a dormant Commerce Clause challenge using a two-tiered analysis.

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). At the

first tier, a court determines whether "a state statute directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Id.* at 579.  *See Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93 (1994) (stating that if a restriction on commerce is discriminatory, it is virtually *per se* invalid). At the second tier, absent such discrimination, if a "statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). In the cannabis context, numerous District Courts have ruled on similar regulatory cannabis licensing schemes, and all applied the heightened level of dormant Commerce Clause scrutiny. *See NPG, LLC v. City of Portland,* No. 2:20-CV-00208, 2020 WL 4741913, at *2 (D. ME. Aug. 14, 2020) (applying heightened standard to a licensing scheme where applications were evaluated on a point scale, with the maximum potential points being thirty-four, with five points awarded if the applicant was "[a]t least [fifty-one percent] owned by individuals who ha[d] been a Maine resident for at least five years"); *see also Ne. Patients Grp. v. Maine Dep't of Admin. & Fin. Servs.*, 554 F. Supp. 3d 177, 180 (D. Me. 2021) *aff'd by* 45 F.4th 542 (1st Cit. 2022); *Taigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 989 (W.D. Mo. 2021); *Variscite NY One. Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022).

Here, the Act directly discriminates against interstate commerce and falls into the first tier. D.C. Code § 7-1671.01(20C) requires applicant businesses to be incorporated in the District of Columbia. Similarly, "a dispensary shall not be permitted to receive or purchase medical marijuana from a person other than a cultivation center registered in the District." 22-C D.C.M.R. § 5700. Social Equity applicants also have to be D.C. residents. D.C. Code § 7-

1671.01(20C). These laws and regulations, on their face, discriminate against interstate commerce by providing differential treatment based on state residency.

When a law falls into the first tier, the government bears the burden of proving the law advances a legitimate local purpose that cannot be adequately served by reasonable, nondiscriminatory alternatives. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). To the best of Plaintiff's knowledge, no jurisdiction has successfully argued residency preferences or residency requirements serve a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory means in the cannabis context.

Plaintiff represents three members who satisfy all requirements of the Act for a social equity cannabis license except that their owners are not District residents. One member of the Alliance is owned by a Virginia resident, and two other members of the Alliance are owned by Maryland residents. All of them would have qualified for the Act's social equity program but for their out-of-state residency. Plaintiff also represents one member incorporated in Virginia who was precluded from participating in the District's medical cannabis program. Therefore, the Act and the ABC Board's licensing scheme violates the dormant Commerce Clause.

### E. FIFTH AMENDMENT – Due Process Void for Vagueness

The void for vagueness doctrine applies to District of Columbia agency enforcement and its medical cannabis statutes. The doctrine requires that laws be written with sufficient clarity so that individuals can understand what conduct is prohibited and to prevent arbitrary and discriminatory enforcement. This principle has been upheld in various cases within the District of Columbia.

In *Woods v. District of Columbia Nurses' Examining Bd*., the court held that unduly vague regulations and statutes are constitutionally inadequate because they deprive individuals of

notice regarding what conduct is proscribed or required and encourage arbitrary decisions. *Woods v. D.C. Nurses' Examining Bd.*, 436 A.2d 369 (D.C. 1981). Similarly, in *District of Columbia v. Walters*, the court found that D.C. Code § 22-1112(a) was void for vagueness because it subjected defendants to criminal liability under an indefinite standard, leading to arbitrary enforcement. *District of Columbia v. Walters*, 319 A.2d 332 (D.C. 1974).

The test for determining unconstitutional vagueness is whether the language of the regulation is so vague, with respect to what conduct is either proscribed or required, that persons of common intelligence must necessarily guess at its meaning. *See Papachristou v. City of Jacksonville, supra* 405 U.S. at 162-63; *Lewis v. District of Columbia Commission on Licensure to Practice the Healing Art, supra* at 1153.

In the *Lewis* case, *supra*, the Commission on Licensure to Practice the Healing Art had suspended Dr. Lewis' license on the ground that he had engaged in "misconduct" by failing to provide adequate supervision of employees administering acupuncture. The Court held that the Commission had deprived Dr. Lewis of due process in suspending his license because it failed to promulgate standards defining the term "misconduct" and thus provided no notice of what conduct was prohibited. *Woods v. D.C. Nurses' Examining Bd.*, 436 A.2d 369, 374 (D.C. 1981) (quoting *Lewis v. D.C. Com. on Licensure to Practice Healing Art*, 385 A.2d 1148, 151-53 (D.C. 1978). *See also Pennsylvania State Board of Pharmacy v. Cohen*, 448 Pa. at 198-201, 292 A.2d at 282-83 (revocation or suspension of pharmacist's license on ground not specifically listed in statute held an impermissibly vague application of statute).

The District of Columbia's conflicting and vague statutory framework creates an environment where lawful businesses cannot discern compliance requirements. This regulatory ambiguity: (1) subjects Plaintiff to penalties for lawful conduct authorized under D.C. Code §

48-904.01(a)(1)(B); (2) enables arbitrary enforcement practices that exacerbate the harm to

Plaintiff's reputation and operations; (3) violates the void-for-vagueness doctrine, which requires

statutes to provide clear standards to prevent discriminatory enforcement. *Woods v. D.C. Nurses'*

*Examining Bd.*

Plaintiff's inability to rely on a stable and consistent regulatory framework magnifies the

risk of business closure and financial ruin, further supporting the need for injunctive relief.

Here, D.C. Code 48-904.01(a)(1)(B) subjects Plaintiff to criminal liability under a

standard so indefinite that they are free to react to conduct not criminalized by the statute. That

vague statute is then used in Chapter 7 Title 16 statutes, cease-and-desist and summary closure

enforcement, and adjudication fact-finding and conclusions of law. This impermissibly delegates

to police, court, and jury basic policy matters to be resolved on an *ad hoc*, after-the-fact basis

with the attendant dangers of arbitrary and discriminatory application.

The Plaintiff highlights regulatory contradictions between D.C. Code § 48-

904.01(a)(1)(B) and enforcement under the Medical Cannabis Amendment Act. These

inconsistencies confuse compliance standards and enable arbitrary enforcement, further

supporting injunctive relief.

### F. FIFTH AMENDMENT TAKINGS

In cases of regulatory takings, the courts apply a multi-factor inquiry as established in

*Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). This inquiry considers

factors such as the character of the government action, the economic impact of the regulation on

the property owner, and the owner's reasonable investment-backed expectations. *Embassy Real*

*Estate Holdings, LLC v. D.C. Mayor's Agent For Historic Preservation*, 944 A.2d 1036 (D.C.

2008), *Gordon v. Dist. of Columbia*, 309 A.3d 543 (D.C. 2024).

Here, the character of the governmental action is unconstitutional and punitive. The economic impact on the property owner is severe, and the owner's reasonable investment-backed expectations have been extinguished.

Under 42 U.S.C. § 1983, any person who, under color of any statute, ordinance, regulation, custom, or usage of any State, Territory, or the District of Columbia, subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of rights secured by the Constitution and laws, shall be liable to the injured party in an action at law or equity. By maintaining and enforcing laws that deprive the Plaintiff of its property rights and causing the loss of economic viability of both the premises and the business itself, the Defendants are enforcing statutes and regulations that amount to a governmental taking without compensation. This violates the Plaintiff's Fifth Amendment rights, entitling the Plaintiff to permanent injunctive relief against such statutes and regulations.

D.C. Code § 7-1671.08(g)(1) provides that ABCA has the authority to inspect an unlicensed establishment and, if it presents an imminent danger to public health or safety, may summarily close and padlock the establishment without a prior hearing, seizing all cannabis and cannabis products found on the premises. Members of Plaintiff received summary closures after complying with cease-and-desist orders and have been attached to summary closure orders without notice. Consequently, the members of Plaintiff have lost the economically viable use of its retail store at summarily close locations.

In issuing summary closures under D.C. Code § 7-1671.08(g)(1), the ABC Board applies D.C. Code § 7-1671.01(22) to establish authority to inspect and summarily close businesses without a prior hearing, allowing for the seizure of cannabis rightfully possessed under D.C. Code § 48-904.01(a)(1)(A). The Plaintiff contends that its right to protect its property from

31

unlawful government actions or those lacking legitimate purpose is substantial enough to warrant a pre-deprivation hearing. The post-deprivation hearing provided is constitutionally insufficient, especially since the enforcement action results in the summary closure and padlocking of the business, effectively nullifying its goodwill and value without compensation.

The statutes, D.C. Code §§ 7-1671.01(9) and (22); § 7-1671.08(g)(1), and the practices of ABCA, MPD, DLCP, and the District of Columbia are unconstitutional on their face because they violate the Fifth Amendment right against governmental takings without compensation in all applications. They do not provide any circumstances under which a litigant can exercise their right to be free from regulatory or governmental takings without compensation. The regulations have directly caused a loss of all economically viable use of the property because a summary closure prevents any use while it remains in effect.

Alternatively, the statutes are constitutionally invalid as applied because they discriminate against businesses engaged in lawful activities where individuals aged 21 or older transfer up to one ounce of cannabis without remuneration, possess up to two ounces, or store cannabis allocated to persons aged 21 or older that does not exceed two ounces per person. ABCA's enforcement through cease-and-desist orders and summary closures results in the loss of all economically viable use of property, amounting to a governmental taking without compensation.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its Fifth Amendment takings claim.

### G. CONTRACTS CLAUSE

To demonstrate a violation of the Contracts Clause due to legislative enforcement compelling a plaintiff to terminate a lease with a landlord in the District of Columbia, the

plaintiff must establish three key elements. First, there must be a substantial impairment of a contractual relationship. This means that the legislation in question has significantly altered the terms or enforceability of the lease agreement (see *Dist. of Columbia Metro. Police Dep't v. Dist. of Columbia Pub. Emp. Relations Bd.,* 301 A.3d 714 (D.C. 2023*); West End Tenants Ass'n v. George Washington University*, 640 A.2d 718 (D.C. 1994)).

In this case, ABCA's enforcement of D.C. Code §§ 7-1671.08, 7-1671.12a, and 7-1675.01 against Plaintiff has substantially impaired the contractual relationship between property owners and members of Plaintiff. The lease agreements between members of Plaintiff and the property owners were terminated due to enforcement action and fear of enforcement action under these statutes. The parties mutually agreed to terminate the leases to avoid potential penalties, thereby significantly altering the enforceability and terms of their contractual relationship.

Second, Plaintiff demonstrates that the impairment is not justified by a significant and legitimate public purpose. This involves proving that the legislative action does not serve a vital public interest substantial enough to warrant the impairment of the contract. *See Dist. of Columbia Metro. Police Dep't v. Dist. of Columbia Pub. Emp. Relations Bd.,* 301 A.3d 714 (D.C. 2023*); West End Tenants Ass'n v. George Washington University,* 640 A.2d 718 (D.C. 1994). Here, the District of Columbia lacks a significant and legitimate public purpose for impairing the contractual relationship because the Plaintiff did not violate D.C. Code Title 7, Chapter 16B. The Plaintiff has not committed any of the offenses considered an imminent danger to public health or safety under D.C. Code §§ 7-1671.08(g)(2) and (h)(1). Any transfers of cannabis on the premises were conducted in compliance with D.C. Code § 48-904.01(a)(1)(B), which permits such activity. Therefore, the legislative enforcement does not serve a substantial public interest that justifies the impairment of the contract.

Third, even if the impairment is justified by a significant public purpose, Plaintiff demonstrates that the impairment is not based upon reasonable conditions or is not of a character appropriate to the public purpose justifying the legislation's adoption. This means that the conditions imposed by the legislation are not reasonably and appropriately tailored to achieve the public purpose without unnecessarily infringing on contractual rights. *See Dist. of Columbia Metro. Police Dep't v. Dist. of Columbia Pub. Emp. Relations Bd.,* 301 A.3d 714 (D.C. 2023*); West End Tenants Ass'n v. George Washington University,* 640 A.2d 718 (D.C. 1994). In this situation, the impairment is not based upon reasonable conditions. Legal activities pursuant to D.C. Code § 48-904.01 that occurred on the Plaintiff's premises have been mischaracterized as violations of D.C. Code Title 7, Chapter 16B, solely because they took place on commercial premises, which is unreasonable. The contractual impairment is not justified by a public purpose because the Plaintiff is compliant with the relevant statutes.

Furthermore, the ABCA's issuance of a summary closure and cease-and-desist without a pre-deprivation hearing exacerbates the unreasonable nature of the impairment. The summary closures applied to both the Plaintiff and the property owner resulted in the locks to the premises being changed, denying access to both parties. The Plaintiff had already vacated the premises and terminated the lease prior to the issuance of the Notice of Summary Closure, rendering the action erroneous. The lease between the Plaintiff and the property owner is a private contract, and the ABCA's actions constitute government interference intended to, and which did, in fact, disrupt this contractual relationship.

D.C. Code §§ 7-1671.01(9) and (22), and § 7-1671.08(g)(1), along with the District of Columbia's enforcement practices, do not provide any circumstances under which a litigant can exercise their protection under the Contracts Clause to be free from government interference

with private contracts. Therefore, these statutes are unconstitutional on their face. Alternatively,

they are unconstitutional as applied because they discriminate against businesses engaged in

lawful activities where individuals aged 21 or older transfer up to one ounce of cannabis without

remuneration, possess up to two ounces, or store cannabis not exceeding two ounces per person.

The enforcement actions, including cease-and-desist orders and summary closures, interfere with

private commercial lease contracts by forcing property owners to terminate leases with such

businesses, violating the Contracts Clause.

　　　Plaintiff demonstrates a substantial likelihood to succeed on the merits of its Contracts

Clause claim.

### H. D.C. CODE §2-509 – Ex Parte Communications

　　　In the District of Columbia, it is fundamental that "the mind of the decisionmaker should

not be swayed by evidence which is not communicated to both parties and which they are not

given an opportunity to controvert. *M.B.E. Inc. v. Minority Bus. Opportunity Comm'n of D.C.*,

485 A.2d 152, 159 (D.C. 1984). Even if the decision-maker does not intend to rely on a

particular *ex parte* communication, such communication should be made part of the record – and

the parties given an opportunity to respond to it – whenever it is relevant to the facts of the case

and the statutory criteria to be applied. *Id.* at 160.

　　　Additionally, in Sloan *v. United States*, 527 A.2d 1277, the court emphasized that *ex*

*parte* communications should not influence the decision-making process and that any appearance

of impropriety can damage public confidence in the judicial system. The court noted that

contacts with the court by counsel or other persons are strongly discouraged unless adequate

notice and opportunity to respond is given to all parties.  *Sloan v. United States*, 527 A.2d 1277

(D.C. 1987).

Furthermore, D.C. Code § 2-509 requires that if a majority of the decision-makers did not personally hear the evidence, the agency must issue a proposed decision and allow parties to file exceptions and present arguments before issuing a final decision. This ensures that all parties have a fair opportunity to be heard and to respond to any *ex parte* communications that may have occurred. *Potomac Elec. Power Co. v. Pub. Serv. Comm'n*, 319 A.3d 392 (D.C. 2024); *see also Gallothom, Inc. v. D.C. Alcoholic Bev. Control Bd.,* 820 A.2d 530 (D.C. 2003).

Here, the ABC Board is not only swayed by evidence not communicated to the opposing party, all ABC Board's cease-and-desist orders were based on such *ex parte* communications. It is the ABC Board's customs and practices that they host closed-door hearings, where the agency's investigator presents evidence unopposed, and then the Board issues a cease-and-desist order. Therefore, the ABC Board's practices directly contravene the fundamental District policy against the use of *ex parte* communications in agency adjudications.

## I. APPROPRIATIONS ACT

The Consolidated Appropriations Act of 2023 prohibits the District government from "enacting any laws, rule, or regulation to legalize or otherwise reduce penalties associated with the possession, use, or distribution of any [cannabis]…for recreational purposes. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 809(b), 136 Stat. 4459, 4722 (2022).

Here, the Act, on its face, expands the District's medical cannabis program. However, this purported goal strains credulity, as the Act allows "patients" to self-certify that they have medical or dental conditions qualifying them for cannabis use. This is clearly an attempt to circumvent the Federal preemption on the District's ability to expand its recreational program. Furthermore, it is also telling that the Act transferred the "medical" cannabis program from the Department of Health to the ABC Board, which also regulates alcohol, restaurants, bars, and

strip clubs. If the Act truly furthered a medical purpose, there would be no reason for the Act to transfer the medical cannabis program to a "vice industry" regulator.

Under D.C. Code § 48-904.01(a)(1)(A) and (B), cannabis transfers without remuneration are legal, meaning that the transfer of small amounts of cannabis between adults without any payment is permissible. However, the Consolidated Appropriations Act of 2023 prohibits the District of Columbia from using any funds to enact or carry out new regulations related to cannabis. This means that the District of Columbia lacks the authority to enforce rules or impose penalties on cannabis-related activities that are legal under existing District of Columbia law. Specifically, the Appropriations Act Rider restricts the District of Columbia from using funds to "legalize" or "reduce penalties" for Schedule I substances, which includes cannabis. Paradoxically, this also prevents the District of Columbia from creating or enforcing regulations that further penalize an activity, such as transfers without remuneration, that is already not subject to penalties under current law.

ABCA, funded by the District's annual budget pursuant to D.C. Code § 25-210 and subject to congressional appropriations, has enforced penalties against the Plaintiff for allowing non-commercial cannabis transfers on its premises. These enforcement actions impose new restrictions that contradict both the allowance of adult-use transfers without remuneration and the prohibition of using funds to regulate or impose penalties on such activities. By doing so, the District of Columbia is effectively reimposing penalties for a legal activity that is beyond its authority, given the federal funding restrictions.

Furthermore, enforcing penalties or restricting these legal cannabis transfers simply because they occur within businesses would require specific legislation with that language. However, such enforcement actions would inherently involve the imposition of new penalties or

restrictions, which the Appropriations Act prohibits the District of Columbia from implementing using either federal or local funds. This enforcement contradicts the spirit of the law and constitutes government overreach, as it necessitates the use of government funds and resources that the law specifically restricts for such purposes.

Additionally, there is a discrepancy between the statutes under Title 48, Chapter 9, and Title 7, Chapter 16B, of the D.C. Code. Title 48, Chapter 9, refers to "marijuana" and outlines the legal activities regarding cannabis, while Title 7, Chapter 16B, refers to "cannabis" and regulates substances beyond the scope of those regulated under Title 48. Enforcing the contradictory statutes of Title 7, Chapter 16B against legal activity found under D.C. Code § 48-904.01(a)(1)(A) and (B), and against substances not regulated by Title 48, effectively imposes penalties for a legal activity, which is beyond the District's authority and violates the federal funding restrictions.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its congressional Appropriations Act prohibition claim.

### J. The Fourth Amendment

Under the United States Constitution, a state statute that authorizes officers to "enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest" is inconsistent with the commands of the Fourth Amendment. *Kirk v. Louisiana*, 536 U.S. 635, 637 (2002) (explaining the Supreme Court's decision in *Payton v. New York*, 445 U.S. 573 (1980)). The Fourth Amendment also applies with equal force in commercial settings. Businessmen, like occupants of homes, have "a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *See v. City of Seattle*, 387 U.S. 541, 544 (1967). Therefore, "administrative entry, without consent, upon the portions

38

of commercial premises which are not open to the public may only be compelled…within the framework of a warrant procedure." *Id*. at 545. *See Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970) (emphasizing that businesses can refuse warrantless search and state actors cannot forcibly enter even in the closely regulated liquor industry where warrantless searches are validly authorized by statues).

Here, D.C. Code § 7-1671.08(g)(1) authorizes ABCA to "inspect the entire premises, inventory, and business records of an unlicensed establishment to determine whether the business is conducting activity in violation of this title." Like the New York statute struck down in *Payton*, this law unconstitutionally authorizes state actors to enter a private premise without a warrant. Like in *See*, ABCA administrative entries, without consent, may only be compelled within the framework of a warrant procedure.

## II.  Plaintiff Demonstrates That It Is Suffering Irreparable Harm During The Pendency Of The Action And Will Continue To Suffer Irreparable Harm If This Injunction Is Not Granted.

A business's "destruction in its current form" commonly qualifies as irreparable harm. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Recoverable monetary loss may constitute irreparable harm" if "the loss threatens the very existence of the movant's business.").

Here, Plaintiff members' businesses all face imminent destruction in their current forms. Two members' businesses were already destroyed by the ABC Board's summary closure orders. These destructions should qualify as irreparable harm.

Additionally, Plaintiff faces immediate and irreparable harm due to the Defendants' unconstitutional actions on multiple levels. Firstly, the violation of constitutional rights,

including unjust property deprivation, interference with private contracts, warrantless searches, denial of jury trials, and discrimination against out-of-state entities, constitutes, per se, irreparable harm that cannot be remedied by monetary damages alone. The Defendants' enactment and enforcement of the medical cannabis legislation threaten the Plaintiff's continued business existence, subjecting it to significant expense and burden in attempting to maintain operations. Enforcement actions have resulted in the Plaintiff's inability to use its business premises, effectively destroying its economic viability and goodwill. ABCA's public enforcement actions and erroneous determinations cast doubt on the legality of the Plaintiff's operations, causing reputational harm that deters future business opportunities and undermines customer trust.

Furthermore, conflicting statutory frameworks create legal uncertainty, prohibiting Plaintiff's ability to conduct lawful business operations. While the Plaintiff complies with D.C. Code § 48-904.01, which legalized the possession and non-remunerative transfer of small amounts of cannabis between adults over 21, Defendants' arbitrary enforcement practices undermine this compliance and put Plaintiff's entire business model at risk. The severity of these harms, particularly the constitutional violations and disruption of business operations, demonstrates the urgent need for injunctive relief.

Historically, D.C. voters approved Initiative 59 in 1998 to legalize medical cannabis for serious illnesses, but its implementation was blocked by Congress through the Barr Amendment. After its repeal in 2009, D.C. established a formal medical cannabis program in 2010. In 2014, D.C. legalized the possession of up to two ounces of cannabis and non-monetary transfers between adults over 21 through the "Legalization of Possession of Minimal Amounts of Marijuana for Personal Use Act of 2014," codified as D.C. Code § 48-904.01. However,

40

Congress imposed the Harris Rider, prohibiting D.C. from using local funds to regulate or tax cannabis sales, effectively preventing the regulation of the recreational cannabis market.

Despite these restrictions, D.C. enacted the Medical Cannabis Amendment Act of 2022 to strengthen the medical cannabis program and indirectly regulate legal recreational cannabis activity. The Act allowed patients to self-certify their need for medical cannabis and established enforcement measures to compel businesses engaging in lawful recreational cannabis transfers to participate in the medical cannabis market. This approach forced businesses into a regulatory framework they were not obligated to join, given that their activities were legal under District of Columbia law. The District of Columbia further enacted restrictive legislation and increased enforcement efforts under the Cannabis Business Enforcement Amendment Act of 2022 and numerous other acts that targeted businesses engaging in, facilitating, or allowing in their premises lawful, non-remunerative cannabis transfers by labeling them as "unlicensed establishments" and imposing penalties based on vague definitions and arbitrary standards.

The Plaintiff's harm is not speculative but immediate and ongoing, including the violation of constitutional rights and loss of its business premises, economic viability, and goodwill. The enforcement actions have effectively destroyed the Plaintiff's ability to operate, causing irreparable harm that cannot be compensated by monetary damages alone. The reputational damage from public enforcement actions further exacerbates this harm, undermining customer trust and deterring future business opportunities.

### III. Plaintiff Demonstrates That The Balance Of The Equities Is In Their Favor.

The magnitude of the Plaintiff members' injuries described above should tip the balance of equities in favor of Plaintiff. *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, No. 23-5129, 2024 WL 4863140 at *10 (D.C. Cir. Nov. 22, 2024).

To elaborate further, Plaintiff is facing immediate and severe harm that threatens the very existence of its business. The enforcement of the challenged Acts, statutes, regulations, and practices not only risks financial ruin but also results in irreparable harm through the deprivation of fundamental constitutional rights, including violations of the Fourth, Fifth, and Seventh Amendments, the Contract Clause, and District of Columbia law. As established in *Dist. of Columbia v. Group Insurance Administration*, economic loss constitutes irreparable harm when it threatens the existence of the movant's business. *Dist. of Columbia v. Group Insurance Administration,* 633 A.2d 2, 23 (D.C. 1993). Similarly, in *District of Columbia v. E. Trans-Waste of Md., Inc.*, the court recognized that enforcement actions carrying the threat of putting a business out of operation or subjecting it to significant expense weigh heavily in favor of injunctive relief. (*District of Columbia v. E. Trans-Waste of Md., Inc.*, 758 A.2d 1, 15 (D.C. 2000).

Without the injunction, the Plaintiff's business will remain shuttered, and its ability to seek redress for these harms will be significantly impaired. The harm is not speculative but concrete and ongoing, including loss of goodwill, customer relationships, and the potential collapse of the business. These damages cannot be adequately compensated by monetary relief alone, as they involve intangible assets essential to the Plaintiff's operations.

Conversely, the Defendants would suffer minimal, if any, harm if the injunction is granted. Enjoining the enforcement of unconstitutional statutes and practices would have little impact on their day-to-day operations concerning cannabis regulation. The Defendants retain the authority to regulate cannabis within constitutional boundaries, and the injunction would merely prevent the enforcement of provisions that infringe upon constitutional rights. This aligns with

the principle that the government cannot claim harm from being enjoined from unconstitutional actions.

Moreover, granting the injunction serves the public interest by upholding constitutional mandates and ensuring that regulatory actions comply with legal standards. The Defendants' misleading public narrative regarding the safety and testing of medical cannabis exacerbates the harm to the Plaintiff and undermines public trust. Historically, ABCA failed to ensure laboratory testing of medical cannabis, allowing untested products to enter the market under the guise of being medically approved. Continuing enforcement under these circumstances risks further eroding regulatory credibility.

By granting the injunction, the Court would not only prevent irreparable harm to the Plaintiff but also promote fairness and integrity in the regulatory process. This action benefits both the Plaintiff and the public by ensuring that cannabis regulation is carried out within the bounds of constitutional and statutory law without arbitrary or discriminatory enforcement. The balance of equities, therefore, weighs heavily in favor of Plaintiff, as the severe and immediate harm faced by the Plaintiff significantly outweighs any minimal inconvenience to the Defendants.

## IV. Plaintiff Demonstrates That The Public Interest Would Not Be Disserved By The Issuance Of This Injunction.

"The Constitution is the ultimate expression of the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Llewelyn v. Oakland Cnty. Prosecutor's Off.*, 402 F. Supp. 1379, 1393 (E.D. Mich. 1975)). As a result, it is "obvious" that "enforcement of an unconstitutional law is always contrary to the public interest." *Id*. at 653. Therefore, there is "presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Davis v. D.C.*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).

43

Here, the issuance of a preliminary injunction fundamentally serves the public interest by ensuring constitutional compliance, fostering economic stability, and protecting public health. The Plaintiff's request compels government actions to adhere strictly to constitutional safeguards, particularly the right to a fair trial and the prohibition against arbitrary regulatory takings. These constitutional rights are the bedrock of a just legal system and embody broader societal values that transcend the Plaintiff's individual circumstances.

Moreover, granting the injunction would enable the Plaintiff to resume lawful business operations, thereby contributing to economic stability and preserving jobs within the community. The Plaintiff's compliance with D.C. Code § 48-904.01 demonstrates adherence to voter-approved regulations, underscoring that the requested relief supports lawful and transparent business practices. This alignment not only reinforces the legitimacy of the Plaintiff's operations but also promotes confidence in regulatory frameworks established by democratic processes.

Additionally, halting enforcement under the current regulatory regime prevents the Defendants from perpetuating misleading claims about the safety and testing of medical cannabis and recreational cannabis. Such misleading narratives undermine public trust. By granting the injunction, the Court would ensure that regulatory actions are based on accurate information and uphold the integrity of public health standards.

In summary, the preliminary injunction is imperative for maintaining constitutional integrity, supporting economic resilience, and safeguarding public health. It aligns with the collective interests of the community by promoting fair and transparent governance, enabling lawful business activities, and preventing the dissemination of harmful misinformation. Therefore, the issuance of the injunction is not only justified but essential to uphold the fundamental principles that benefit both the Plaintiff and the broader public.

## CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that this Court issue a

preliminary injunction to halt the Defendants' unconstitutional enforcement actions. The Plaintiff

has demonstrated a substantial likelihood of success on the merits, irreparable harm in the

absence of relief, a favorable balance of equities, and alignment with the public interest. By

granting the injunction, the Court will preserve the Plaintiff's constitutional rights, prevent

further harm, and ensure that the regulatory framework governing cannabis activity in the

District of Columbia adheres to lawful and fair standards.


## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court grant its Motion for

Preliminary Injunction.


By:/s/Jacobie Whitley
Jacobie Whitley, Esq. (DC Bar #1500314)
Law Office of Jacobie K Whitley, PLLC
1455 Pennsylvania Avenue NW
Suite 400
Washington, DC 20004
Tel: (202) 499-2403
Fax: (202) 499-2402
Email: jwhitley@lawofficeofjkw.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify the above Complaint was sent electronically via the CM-ECF document filing system on December 11, 2024 and mailed First Class Certified Mail with Return Receipt requested, on December 12, 2024, to the parties listed below:

Office of the Mayor of the District of Columbia
1350 Pennsylvania Avenue, N.W.
Washington, DC 20004

Muriel Bowser,
1350 Pennsylvania Avenue, N.W.
Washington, DC 20004

Attorney General Brian Schwalb,
400 6th Street N.W. Washington, DC 20001

Alcoholic Beverage and Cannabis Administration
Director Fred Moosally,
899 North Capitol Street, NE, Suite 4200-A
Washington, DC 2000

Department of Licensing and Consumer Protection
Director Tiffany Crowe
1100 4th Street SW, Washington, DC 20024

Metropolitan Police Department
Chief Pamela A. Smith,
441 4th Street N.W. 7th Fl., Washington, D.C. 20001

/s/Jacobie Whitley
Jacobie Whitley, Esq.